908 F.2d 1395
 Steven J. GOODWIN, Appellant,
v.
C.A. TURNER, Warden, U.S. Medical Center for Federal
Prisoners; George Wilkerson, Regional Director, Bureau of
Prisons; Director Quinlan, Bureau of Prisons; Edwin Meese,
Attorney General, Appellees.
 No. 89-1101WM.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 18, 1990.
Decided July 17, 1990.
Rehearing and Rehearing En Banc
Denied Sept. 25, 1990.
 
 Ronald L. Kuby, New York City, for appellant.
 Richard E. Monroe, Springfield, Mo., for appellees.
 Before McMILLIAN and MAGILL, Circuit Judges, and HANSON,* Senior District Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Steven J. Goodwin appeals the district court's[1] order denying his petition for writ of habeas corpus filed pursuant to 28 U.S.C. Sec. 2241. Goodwin, a federal prisoner incarcerated in Missouri, argues that the Bureau of Prison's (Bureau's) refusal to allow him to ejaculate into a clean container so that his semen could be used to artificially inseminate his wife violates his constitutional right to procreate. The district court rejected Goodwin's claim holding that because the right to procreate is fundamentally inconsistent with incarceration, it does not survive incarceration. Goodwin v. Turner, 702 F.Supp. 1452, 1453 (W.D.Mo.1988). This is a case of first impression. However, we need not reach that issue because, even assuming Goodwin's right to procreate survives incarceration, the Bureau's restriction is reasonably related to its legitimate penological interest of treating all prisoners equally, to the extent possible. Therefore, we affirm, albeit on other grounds.
 
 I.
 
 2
 Goodwin is a prisoner incarcerated at the United States Medical Center for Federal Prisoners in Springfield, Missouri (Medical Center), pursuant to a lawful criminal conviction.[2] His wife, who is currently thirty years old, is not incarcerated. Despite Goodwin's imprisonment, they desire to conceive a child. They do not want to delay conception until his release because of their concern about the increased risk of birth defects as a result of increasing maternal age. Goodwin will be eligible for parole on September 2, 1991. His latest release date is February 26, 1995. However, prison authorities have stated that there is "good reason to believe [Goodwin] will be released closer to his parole eligibility date [than his latest release date]." Joint Appendix at 42.
 
 
 3
 The overall risk for all age groups of giving birth to a child with Down's syndrome or a chromosomal abnormality is 1 in 650 and 1 in 200 to 300, respectively. At the time of Goodwin's parole eligibility, Goodwin's wife will be thirty-one years old. Her risk of having a child with Down's syndrome or a chromosomal abnormality will be 1 in 500 to 700 and 1 in 300, respectively. The chances of her having a genetically healthy baby will be 997 out of 1000.
 
 
 4
 At the time of Goodwin's latest release date in 1995, his wife will be thirty-five years old. Her risk of having a child born with Down's syndrome or a chromosomal abnormality will be 1 in 450 and 1 in 225, respectively. Therefore, her chances of having a genetically health baby will be 995 out of 1000.[3]
 
 
 5
 On June 8, 1987, Goodwin requested authorization and assistance from prison officials so that he could artificially inseminate his wife. In refusing permission, prison authorities stated that the Bureau had no program or provisions for implementing his request. Goodwin appealed this decision but his requests were similarly denied.
 
 
 6
 On August 17, 1987, Goodwin filed a pro se petition for writ of habeas corpus pursuant to Sec. 2241. He sought a court order to force the prison authorities: (1) to grant him permission "to produce acceptable semen for impregnation of his wife"; (2) to allow several doctors from the University of Missouri School of Medicine, or other accredited doctors, such as his personal doctor and, at most, one medical assistant to enter the institution "for the purpose of properly collecting [his] semen under safe and sanitary procedures and for freezing said semen in the proper manner"; (3) to give him tests to ensure he was free of sexually transmitted diseases including the HIV virus;[4] and (4) to refrain from transferring him to any other institution until the dispute was fully resolved. Joint Appendix at 6. Goodwin did inform prison officials that he would bear all financial costs of the procedure. Id. at 3. On September 17, 1987, Goodwin further suggested that instead of bringing doctors into the prison, the prison officials could make arrangements for one of the Bureau contract hospitals in Springfield to perform the procedure. Id. at 25.
 
 
 7
 On November 18, 1987, the magistrate recommended granting Goodwin's petition, in part, holding that his right to bear or beget children survives his incarceration. Goodwin v. Turner, No. 87-3488-CV-S-WRC, slip op. at 3 (W.D.Mo. Nov. 18, 1987). The magistrate further stated that the prison's denial of Goodwin's request for artificial insemination on the ground that it did not have a program or provision for his request violated his right to due process. Therefore, the magistrate recommended that Goodwin submit his request in a clear and detailed fashion so that prison officials could either accommodate his request or make specific objections thereto.
 
 
 8
 In response to the magistrate's report, the executive staff of the Bureau adopted a policy statement regarding artificial insemination. The statement provides in part that
 
 
 9
 sound correctional policy dictates against allowing inmates to artificially inseminate another person.... [I]f [artificial insemination were] allowed in one case, all of [the Bureau's] institutions would either have to develop collection, handling, and storage procedures for semen or be opened up to private medical or technical persons to come in to collect the semen. This situation would either require a significant drain on resources or create significant security risks, especially in connection with inmates with a high security classification.... The Bureau strives, to the extent possible, to treat all inmates equally. Therefore, in connection with indigent inmates, the Executive Staff felt that the Bureau would be in the position of having to either provide or pay for these services for these inmates and, with respect to female inmates, to significantly expand the medical services available.
 
 
 10
 Joint Appendix at 36-37.
 
 
 11
 After the magistrate issued its opinion and the Bureau announced its policy, Goodwin again changed his proposal. He argued to the district court and argues to us now that he is seeking only an order that the Bureau "provide [him] with a clean container in which to deposit his ejaculate, and a means of swiftly transporting the ejaculate outside the prison." Appellant's Brief at 10. Goodwin argues that because his wife could inject the semen herself with a clean pipette or syringe in a prison bathroom or a nearby hotel, outside personnel would not have to enter the institution to assist in the process.[5]
 
 
 12
 After reviewing the record "with utmost scrutiny," the district court denied Goodwin's petition, holding that "he does not have a fundamental constitutional right to father a child through artificial insemination that survives incarceration." Goodwin v. Turner, 702 F.Supp. at 1453 (W.D.Mo.1988). It is from this order that Goodwin appeals.
 
 II.
 
 13
 The right to procreate has been consistently recognized as a fundamental right. See Carey v. Population Services Int'l, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1976); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); Skinner v. Oklahoma, 316 U.S. 535, 536, 541, 62 S.Ct. 1110, 1111, 1113, 86 L.Ed. 1655 (1942). Because "no 'iron curtain' separates" prisoners from the Constitution, Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1983) (quoting Wolff v. McDonnell, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)), a prison inmate " 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' " Turner v. Safley, 482 U.S. 78, 95, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64 (1987) (quoting Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). Goodwin argues that the district court erred in holding that the fundamental right to procreate does not survive incarceration. We need not decide whether Goodwin's right to procreate by means of artificial insemination actually survives incarceration. Even assuming, without deciding, that the exercise of Goodwin's right to procreate is not fundamentally inconsistent with his status as a prisoner, the restriction imposed by the Bureau is reasonably related to achieving its legitimate penological interest. To this issue we now turn.
 
 A.
 
 14
 We must first ascertain the appropriate standard for reviewing prison restrictions on an inmate's fundamental constitutional right. Goodwin argues that we must review such a restriction under a standard of strict scrutiny. We disagree. In Washington v. Harper, --- U.S. ----, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990),[6] the Supreme Court explained that the "proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.' " Id. --- U.S. at ----, 110 S.Ct. at 1037 (quoting Turner, 482 U.S. at 89, 107 S.Ct. at 2261). The Court held that this standard must be applied even when the "constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." Harper, --- U.S. at ----, 110 S.Ct. at 1037. Therefore, because the Bureau's administration of the prisons implicates Goodwin's constitutional rights, the standard of review adopted in Turner applies. See id. at ---- - ----, 110 S.Ct. at 1037-1038.
 
 
 15
 We reject, as without merit, Goodwin's argument that because the prison regulation has a direct impact on his wife's right to procreate, it should be subject to strict scrutiny. We cannot subject prison regulations to strict scrutiny every time a family member is affected by the prison regulation. Incarceration necessarily deprives an individual of the freedom "to be with family and friends and to form the other enduring attachments of normal life." Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). By its very nature, incarceration necessarily affects the prisoner's family. See Southerland v. Thigpen, 784 F.2d 713, 717-18 (5th Cir.1986). For example, a wife's constitutional right to freedom of association is directly impinged by prison regulations which limit her ability to visit with her husband while he is incarcerated. We would not, however, subject such a regulation to strict scrutiny merely because her associational rights were implicated. Such restrictions on the prisoner's liberty would be sustained if they were reasonably related to achieving a legitimate penological objective. To that extent, the wife's associational rights are not relevant. Therefore, we need only determine whether the Bureau's restriction on Goodwin's right to procreate is reasonably related to achieving a legitimate penological objective.
 
 B.
 
 16
 In deciding whether the challenged regulation meets this reasonable basis test, Turner instructs us to consider various factors. First, there must be a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89, 107 S.Ct. at 2262 (quoting Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). Second, where alternative means of exercising the right remain open to the prisoner, courts should be "particularly conscious of the 'measure of judicial deference owed to corrections officials.' " Turner, 482 U.S. at 90, 107 S.Ct. at 2262 (quoting Pell v. Procunier, 417 U.S. at 827, 94 S.Ct. at 2806). Third, we must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90, 107 S.Ct. at 2262. Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," however, prison officials do not "have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. at 90-91, 107 S.Ct. at 2262.
 
 
 17
 The Bureau's regulation satisfies the test enunciated in Turner. First, the prison prohibition on inmate procreation, even if accomplished in the simple manner ultimately suggested by Goodwin, is rationally related to the Bureau's interest of treating all inmates equally, to the extent possible. Such an interest is a legitimate penological interest.[7] Cf. Madyun v. Franzen, 704 F.2d 954, 962 (7th Cir.) ("male and female inmates must receive substantially equal facilities and conditions while in prison"), cert. denied, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). According to the Bureau's artificial insemination policy statement, if the Bureau were forced to allow male prisoners to procreate, whatever the means, it would have to confer a corresponding benefit on its female prisoners. The significant expansion of medical services to the female population and the additional financial burden of added infant care would have a significant impact on the allocation of prison resources generally and would further undercut the Bureau's limited resources for necessary and important prison programs and security. Cf. Turner, 482 U.S. at 90, 92, 107 S.Ct. at 2262, 2263; Southerland, 784 F.2d at 718. Goodwin concedes as much. In his brief he states that "[a] pregnant prisoner requires special medical services which may or may not be available within the institution, special diet, exercise, and other pre- and post-natal care." Petitioner's Brief at 22-23. Therefore, pursuant to Bureau policy of treating all prisoners the same, to the extent possible, male prisoners cannot be allowed to procreate while incarcerated because the Bureau cannot afford to expand its medical services for its female prisoners to accommodate their desire to procreate.
 
 
 18
 Goodwin argues that "[w]hether a prison can deny a woman's right to conceive while in prison, on the grounds of administrative burden, is an issue to be decided another day in the context of an actual case and a specific request." Appellant's Brief at 23 (emphasis in original). This argument misses the point. We do not hold that if the Bureau allows Goodwin to procreate, then it must as a matter of constitutional law allow its female inmates to procreate. We merely note that as a matter of the Bureau's established prison policy, and not as a matter of constitutional law, if male inmates are allowed to procreate, the Bureau will either be forced to accord some similar benefit on its female inmates or compromise its legitimate policy. Therefore, the burden imposed upon the Bureau as a result of expanded medical services to its female inmates is relevant to this case.
 
 
 19
 Second, although there are no alternative means of exercising Goodwin's right to procreate that remain open to him besides awaiting release, the regulation is still reasonable. The lack of such alternative avenues stems from the fact that none can exist without compromising prison policy or expending a large amount of prison resources accommodating the requests of its female prisoners. This absence of ready alternatives constitutes evidence of the reasonableness of the Bureau's policy.
 
 
 20
 Finally, accommodation of Goodwin's asserted constitutional right will have a significant impact on other inmates. Accommodation would force the Bureau to grant its female inmates expanded medical services, thereby taking resources away from security and other legitimate penological interests. The accommodation of the female inmates is just the kind of " 'ripple effect' " to which the Turner Court referred. As a result, we should "be particularly deferential to the informed discretion of [the Bureau] officials." Turner, 482 U.S. at 90, 107 S.Ct. at 2262. Therefore, we conclude that the Bureau's restriction on inmate procreation satisfies the reasonable relationship standard.
 
 III.
 
 21
 In conclusion, we hold that the appropriate standard in reviewing an inmate's claim that his fundamental rights have been infringed is the reasonable relationship test enunciated in Turner. We further hold that the Bureau's restriction on inmate procreation is reasonably related to furthering the legitimate penological interest of treating all inmates equally, to the extent possible. Therefore, we affirm.
 
 
 22
 McMILLIAN, Circuit Judge, dissenting.
 
 
 23
 I respectfully dissent. The issue in this case of first impression is whether the Bureau of Prisons (Bureau) should be required to provide Steven J. Goodwin (Goodwin), a federal prisoner incarcerated at the United States Medical Center for Federal Prisoners in Springfield, Missouri, with assistance in his effort to artificially inseminate his wife. Goodwin specifically requests that the Bureau provide him with a clean container in which to deposit his semen and a means of swiftly transporting the container outside of the prison. See ante at 1398, 1399 n. 7. Because of the fundamental importance of the right of procreation and the minimal burden that accommodation of Goodwin's narrowly tailored request would impose on the Bureau, I would reverse the district court's order and grant Goodwin's request for a writ of habeas corpus. At a minimum, I would reverse and remand this action to the district court with instructions to properly apply the Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (Turner ), balancing test in the first instance.
 
 
 24
 Although Goodwin makes a colorable argument that this case should be reviewed under a heightened scrutiny standard, I need not reach this question.[1] I believe that the Bureau's decision is not reasonably related to legitimate penological interests, and therefore does not pass constitutional muster under the Turner rational relationship standard of review. See 482 U.S. at 97, 107 S.Ct. at 2266 (no need to reach question of whether heightened scrutiny review is appropriate because challenged regulation prohibiting most inmate marriages falls under the rational relationship test).
 
 
 25
 A. Right to Procreation Survives Incarceration
 
 
 26
 When applying the Turner test, we first identify the precise right implicated by the challenged action and determine whether that right survives incarceration. See id. at 95, 107 S.Ct. at 2265. Goodwin argues, and the majority agrees, see ante at 1398, that the Bureau's refusal to accommodate his request burdens his right to procreation. The majority also correctly acknowledges that the right to procreation is a fundamental right. See ante at 1398. The United States Supreme Court has firmly established the status of the right to procreation as a fundamental right. "The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices." Carey v. Population Services International, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977) (Carey ); see Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974) "[t]his Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause"); Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972). The "rights to conceive and raise one's children have been deemed 'essential,' 'basic civil rights of man,' and '[r]ights far more precious ... than property rights.' " Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (citations omitted).
 
 
 27
 A "prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' " Turner, 482 U.S. at 95, 107 S.Ct. at 2265 (quoting Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). The district court held that Goodwin's right to procreation was fundamentally inconsistent with the fact of imprisonment, and thus did not survive incarceration. See Goodwin v. Turner, 702 F.Supp. 1452, 1454 (W.D.Mo.1988) (Goodwin ). On appeal, the majority needlessly equivocates on resolving this issue, holding that, even if the right survives, the Bureau's refusal to accommodate Goodwin's request is reasonably related to legitimate penological interests. See ante at 1398. Although the right to procreation can, like the right to marry, be substantially restricted as a result of incarceration, see Turner, 482 U.S. at 95, 107 S.Ct. at 2265, I think there is little question that the procreative right survives incarceration. Courts have found that other privacy rights of personal choice in family matters survive incarceration and deserve protection subject to legitimate penological objectives, and there is every reason to believe that the same holds true for the right to procreation. See, e.g., Turner, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (right to marry survives incarceration); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (Skinner ) (Arkansas law permitting the sterilization of habitual criminals unconstitutional); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3rd Cir.1987), cert. denied, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988) (Lanzaro ) (right to elect an abortion survives incarceration and prison must provide access and funding for such). Examination of these cases will confirm that the right to procreation survives incarceration.
 
 
 28
 The Turner decision, which held that the right to marry survives incarceration, see 482 U.S. at 96, 107 S.Ct. at 2265, strongly suggests that the right to procreation also survives incarceration. "Marriage and procreation are fundamental to the very existence and survival of the race." Skinner, 316 U.S. at 541, 62 S.Ct. at 1113. While it is certainly possible to have procreation without marriage and vice versa, the stability and progress of our society is enhanced when marriage and procreation occur together. Our society places special emphasis on procreation within the marriage relationship, and the two rights are viewed in tandem. Because of its fundamental nature and importance to the marriage relationship, the right to procreation, like the right to marry, must survive incarceration.
 
 
 29
 In Skinner, the case most directly on point, the Supreme Court held that an Oklahoma statute permitting the sterilization of habitual criminals violated the equal protection clause. 316 U.S. at 541, 62 S.Ct. at 1113. In that decision, the Court expressed grave reservations about vesting the power to sterilize in the hands of the state. "The power to sterilize, if exercised, may have subtle, far-reaching, and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither and disappear." Id. If the right to procreation did not survive incarceration, prison officials would presumably be free to take away the capacity to procreate upon incarceration.
 
 
 30
 The district court found Skinner distinguishable because the statute ruled unconstitutional would have caused a permanent deprivation of the means to procreate, whereas the Bureau's refusal to accommodate Goodwin's request merely delayed the act of procreation until release.[2] Goodwin, 702 F.Supp. at 1454. While it is true that the Bureau's action delays rather than permanently deprives Goodwin of his right to procreation, I believe Skinner clearly lends support to the conclusion that the right to procreation survives incarceration. If the right did not survive incarceration, states would presumably be free to take away the capacity to procreate upon incarceration, which the Supreme Court found unconstitutional in Skinner.
 
 
 31
 Finally, the Third Circuit's decision in Lanzaro also supports the conclusion that the right to procreation survives incarceration. In Lanzaro, the Third Circuit held that the right of choice to elect an abortion survived incarceration and restrictions must be justified by a legitimate penological objective. 834 F.2d at 334 n. 11. In support of its holding, the court cited Turner and Skinner to demonstrate that significant rights of privacy survive incarceration. Id. Like the rights to marry, to be free of compulsory sterilization, and to choose to terminate a pregnancy, the right to procreation is within that cluster of constitutionally protected choices that survives incarceration. See Carey, 431 U.S. at 685, 97 S.Ct. at 2016.
 
 B. Application of Turner Balancing Test
 
 32
 Having determined that Goodwin's fundamental right to procreation has been implicated and that this right survives incarceration, I next address whether the Bureau's restriction of this right is permissible. In Turner, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. at 2261. Although the Turner test reflects the need to accord appropriate deference to prison officials, see O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (O'Lone ), its "reasonableness standard is not [a] toothless [one]." Thornburgh v. Abbott, --- U.S. ----, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989) (Abbott ) (citation omitted). The Turner Court identified four factors that courts should consider in assessing the reasonableness of a challenged prison regulation. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89, 107 S.Ct. at 2262 (quoting Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984) (Block )). Secondly, courts assess whether there are "alternative means of exercising the right that remain open to prison inmates." Id. 482 U.S. at 90, 107 S.Ct. at 2262. Third, courts consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. Finally, courts consider whether any ready alternatives exist to the challenged regulation. Id. In the present case, the district court did not examine these factors because it found that Goodwin's asserted right did not survive incarceration. Goodwin, 702 F.Supp. at 1454. Nevertheless, the majority applies the Turner test for the first time on appeal, holding that the Bureau's policy totally prohibiting artificial insemination is rationally related to the Bureau's interest in treating all inmates equally, to the extent possible. Ante at 1400. I believe it would be preferable to require the district court to make the necessary findings of fact and apply the Turner test in the first instance. Assuming it is proper to apply the Turner test for the first time on appeal, I would grant the writ of habeas corpus because the Bureau's policy is not reasonable, but an "exaggerated response" to prison concerns. See 482 U.S. at 90, 107 S.Ct. at 2262.
 
 
 33
 The first Turner factor requires a rational connection between the prison regulation and the legitimate governmental interests put forward to justify it. This is a multifold consideration: (1) the objective underlying the regulation or policy must be neutral and legitimate and (2) the regulation or policy must be rationally related to that objective. See Abbott, 109 S.Ct. at 1882. The reasons advanced by the Bureau for denying Goodwin's request have been evanescent and shifting.[3] After considerable prompting, the Bureau issued a policy prohibiting inmates from artificially inseminating another person, and offered several widely diverging reasons in support of this rule. The majority finds all of the Bureau's justifications insufficient except for one,[4] holding that the Bureau's denial of Goodwin's request is rationally related to its "interest of treating all inmates equally, to the extent possible." Ante at 1399 (emphasis added). The Bureau claims that if it accommodates Goodwin's request, it would have to extend a corresponding benefit on its female and indigent prisoners, thus requiring a significant expansion of medical care and additional financial expenditures for infant care. I first address whether this asserted interest of equal treatment policy is neutral and legitimate. See Turner, 482 U.S. at 90, 107 S.Ct. at 2262; Abbott, 109 S.Ct. at 1882. I agree that the equal treatment of inmates is, as a general matter, a neutral and legitimate penological objective.[5] However, equal treatment of inmates is not a legitimate interest when it is accomplished at the expense of denying the exercise of an otherwise accommodatable constitutional right. Moreover, the case before us does not present an issue of equal treatment. The equal treatment objective becomes relevant only if we accept the Bureau's speculation that granting Goodwin's novel request will lead to numerous requests by female inmates, and thus result in added financial burdens and profound administrative problems. The Bureau's real objection to Goodwin's request is based on potential administrative and financial concerns, cast in equal treatment terms. While equal treatment is generally a neutral and legitimate penological objective, the interest in equal treatment is, at best, only tangentially present here.
 
 
 34
 I next examine whether the Bureau's blanket prohibition of artificial insemination is rationally related to its interest in treating inmates equally. See Abbott, 109 S.Ct. at 1882. I do not believe that the Bureau's policy, which effectively refuses to accommodate a constitutional right simply because exercise of the right might be unduly burdensome in other circumstances, is rationally related to its interest in treating inmates equally. If equal treatment is a sufficient basis to deny inmates otherwise accommodatable constitutional rights, then prisons would never be required to accommodate such rights because it is quite likely that any asserted right might legitimately be withheld from some inmates somewhere. Prisons are often required to accommodate the exercise of a particular right in some circumstances and, because of different security or administrative burdens, permitted to deny it in others. In sum, the Bureau's policy fails to satisfy the first prong of the Turner test because equal treatment is not a legitimate objective when it comes at the expense of denying otherwise accommodatable constitutional rights. Nor is the Bureau's blanket prohibition of artificial insemination rationally related to its interest of equal treatment, because equal treatment is not rationally furthered by denying all inmates a constitutional right simply because it might be legitimately denied to some.
 
 
 35
 Secondly, I examine whether there are alternative means available for Goodwin to exercise his right to procreation. See Turner, 482 U.S. at 90, 107 S.Ct. at 2262. This prong of the Turner test focuses on the extent the inmate has been deprived of the asserted right. It is clear that Goodwin has no other means available to exercise his right to procreation.[6] The majority correctly recognizes that "there are no alternative means of exercising Goodwin's right to procreate that remain open to him besides awaiting release," but minimizes the deprivation because no alternatives can exist "without compromising prison policy or expending a large amount of prison resources accommodating the requests of its female prisoners." Ante at 1400. I believe the majority has misapplied Turner by injecting the prison interests into this inquiry, thereby taking the focus off the inmate's injury and improperly weighing the alleged burden on the prison twice, in both the second and third factors.
 
 
 36
 The third consideration is the impact accommodation of the right will have on the guards, other inmates, and the allocation of prison resources generally. Id. 482 U.S. at 90, 107 S.Ct. at 2262. Goodwin's right to procreation can be accommodated at a negligible cost to prison security, administration, and allocation of resources. In order to accommodate Goodwin's right, all the Bureau needs to do is provide Goodwin with a clean container in which to deposit his semen, and allow the container to be given to his wife. The container need not be sterile, and Goodwin has repeatedly offered to pay whatever minimal expenses are incurred. Any impact in accommodating Goodwin's right is obviously de minimis.
 
 
 37
 The majority finds that accommodation of Goodwin's right will have a significant impact on the prison by considering a hypothetical case not before the court. The majority states that accommodation of Goodwin's right "would force the Bureau to grant its female inmates expanded medical services, thereby taking resources away from security and other legitimate penological interests."[7] Ante at 1400 (emphasis added). Because these asserted administrative and financial burdens are hypothetical and not present in this case, we need not give them significant weight. See Carey, 431 U.S. at 691, 97 S.Ct. at 2019 ("the prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights"); Lanzaro, 834 F.2d at 336 ("courts have been reluctant to consider costs to the institution as a major factor in determining whether a constitutional violation exist[s] ").
 
 
 38
 If a female inmate requested to be artificially inseminated and bear a child in prison, that would present a different case. The additional medical, financial, and administrative burdens might well justify the denial of such a request. Courts have recognized that different treatment of male and female inmates does not necessarily offend equal protection. See Pitts v. Thornburgh, 866 F.2d 1450, 1454-59 (D.C.Cir.1989) (prison policy of incarcerating female inmates in West Virginia while male inmates are incarcerated near District of Columbia does not violate equal protection because government's interest in preventing overcrowding and traditional separation of genders in prison are substantially related to gender classification); Morrow v. Harwell, 768 F.2d 619, 626 (5th Cir.1985) (prison policy granting more visiting hours for male inmates does not violate equal protection because males constitute a greater proportion of population and no individual inmate received more time based on gender). A female inmate's request for artificial insemination is not before us today. We should decide cases on a case-by-case basis, and encourage the accommodation of inmates' constitutional rights where possible. Simply because an inmate right must be accommodated in one case does not mean that it must be accommodated in every other.
 
 
 39
 The final Turner factor, which the majority does not apply, examines whether there are any "ready alternatives" to the challenged prison regulation. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." 482 U.S. at 90, 107 S.Ct. at 2262. Two alternatives to the Bureau's complete prohibition of artificial insemination readily come to mind. First, the Bureau could resolve such requests on an individualized basis. If an inmate's request would unduly burden the prison or require a significant diversion of resources, the Bureau could simply deny it. There is no indication that case-by-case resolution of such requests would significantly strain prison resources.[8] A second alternative to the Bureau's blanket prohibition would be the promulgation of a policy which permits artificial insemination only if accommodation of the inmate's request will cause no significant burden on prison security, administration, and allocation of resources. The availability of two ready alternatives which accommodate Goodwin's right "at de minimis cost to valid penological interests [constitutes] ... evidence that the [Bureau's policy] does not satisfy the reasonable relationship standard." Id. at 91, 107 S.Ct. at 2262.
 
 CONCLUSION
 
 40
 Neither prisons nor courts should deny a reasonable request for the exercise of a constitutional right simply because it is novel. A careful application of the Turner test to Goodwin's narrowly tailored request in the case before us convinces me that the Bureau's complete prohibition of artificial insemination is an exaggerated response not reasonably related to legitimate penological interests. Because I believe that Goodwin's right to procreation can be accommodated at de minimis cost to valid penological interests, I would reverse the district court and grant the writ of habeas corpus. At a minimum, I would reverse and remand this cause with directions that the district court fully apply the Turner test in the first instance.
 
 
 
 *
 THE HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation
 
 
 [1]
 The Honorable William R. Collinson, Senior United States District Judge for the Western District of Missouri
 
 
 [2]
 Goodwin was assigned to the Medical Center for nonmedical reasons including the proximity of his family to the institution
 
 
 [3]
 The record indicates there are also risks inherent in artificial insemination. According to a Medical Center physician, "if the semen [is] not maintained or injected under the proper conditions, the procedure, at best, may be ineffective and, at worst, result in a birth defect or illness or injury to the recipient." Joint Appendix at 19
 
 
 [4]
 The record indicates that Goodwin had already been tested for the virus before he had requested permission to artificially inseminate his wife. The results of the test were negative
 
 
 [5]
 Once again, Goodwin offered to bear any expense incurred by the Medical Center
 
 
 [6]
 The Supreme Court announced its opinion in this case more than one month after oral argument in Goodwin's case
 
 
 [7]
 Nearly all of the other interests asserted by the Bureau are not relevant to Goodwin's specific request to artificially inseminate his wife. Goodwin merely seeks to obtain a clean container, and permission to ejaculate into the container and have its contents given to his wife. Most of the interests advanced by the government, and the corresponding burdens described, concern a much more sophisticated and intrusive type of artificial insemination corresponding to Goodwin's original requests. Other interests advanced by the Bureau are not legitimate penological interests because they involve the advancement of concerns such as decreased burden on the welfare rolls that have nothing to do with prison administration. Still other interests such as tort liability are irrelevant given Goodwin's and his wife's willingness to sign a waiver releasing the Bureau from all potential tort liability. In any event, the grounds for such liability even absent the waiver would be far-fetched at best
 
 
 [1]
 In Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (Martinez ), the Supreme Court reviewed the constitutionality of California prison regulations which permitted the censorship of inmate letters that "unduly complain," "magnify grievances," or "express inflammatory political, racial, religious, or other views or beliefs." Id. at 399, 94 S.Ct. at 1804. The Court noted that the regulations implicated not only the rights of prisoners but the "inextricably intertwined" rights of free citizens "who have a particularized interest in communicating with them." Id. at 408, 94 S.Ct. at 1809. Because "the First Amendment liberties of free citizens [were] implicated in censorship of prisoner mail," id. at 407, 94 S.Ct. at 1808, the Court reviewed the regulations under a heightened scrutiny, permitting censorship only if it "further[s] an important or substantial governmental interest unrelated to the suppression of expression," and "the limitation of First Amendment freedoms [is] ... no greater than is necessary or essential." Id. at 413, 94 S.Ct. at 1811
 In Turner v. Safley, the Supreme Court enumerated and applied a four-part reasonable relationship test for evaluating "prison regulation[§ that] impinge ... on inmates' constitutional rights." 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (Turner ) (emphasis added). However, a unanimous Court was careful to note that a challenged regulation prohibiting inmates from marrying civilians as well as other inmates without the warden's approval might be subject to review under the Martinez heightened scrutiny test, "because the regulation may entail a 'consequential restriction of the constitutional rights of those who are not prisoners.' " 482 U.S. at 97, 107 S.Ct. at 2266 (quoting Martinez, 416 U.S. at 409, 94 S.Ct. at 1809). The Court chose not to apply Martinez because "even under the reasonable relationship test, the marriage relationship does not withstand scrutiny." Id.
 The continued scope and vitality of the Martinez test has recently been called into question. In Thornburgh v. Abbott, --- U.S. ----, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989) (Abbott ), the Court limited the scope of Martinez in the first amendment context to outgoing inmate correspondence, which does not pose the same security concerns as incoming correspondence. Id. 109 S.Ct. at 1881. Applying the Turner rational relationship test, the Court upheld a federal prison regulation permitting prison wardens to reject publications intended for inmates that are " 'detrimental to the security, good order, or discipline of the institution ...' " Id. 109 S.Ct. at 1877 (quoting 28 C.F.R. Sec. 540.71(b)). The Court also appeared to retreat from its settled position that heightened scrutiny is appropriate when the rights of outsiders as well as prisoners are implicated. See 109 S.Ct. at 1879 n. 9 ("[w]e do not think it sufficient to focus, as respondents urge, on the identity of the individuals whose rights have allegedly been infringed"). Because I believe the Bureau's prohibition of all artificial insemination fails under the Turner test, it is not necessary to grapple with the question of what remains of Martinez after Abbott.
 
 
 [2]
 The district court's conclusion that no constitutional right was implicated because the Bureau's action only delayed Goodwin's exercise of the right begs the question. Taking the district court's reasoning to its logical conclusion, few (if any) constitutional rights would survive incarceration because nearly all inmates will be released at some point in the future and, therefore, it can almost always be said that enjoyment of an asserted right is merely "delayed." Such reasoning has been implicitly rejected in the numerous Supreme Court decisions holding that many constitutional rights survive incarceration and must be accommodated consistent with legitimate penological objectives. See, e.g., O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1983) (O'Lone ) (retention of first amendment right of free exercise of religion); Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (right of meaningful access to courts retained by inmates); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (due process protections extend to inmate disciplinary proceedings); Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (retention of certain first amendment rights of free speech); Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam) (retention of equal protection right to be free of invidious racial discrimination). The fact that the exercise of a right is delayed is not relevant to whether the right survives incarceration
 
 
 [3]
 While it is true that Goodwin's request for relief has changed during the course of this litigation, pinning down the reasons for the Bureau's denial of his request has proved even more difficult. Goodwin's request for assistance was originally denied because the "Bureau ... has no program or provisions for such a request." Joint Appendix (J.A.) at 9. Goodwin appealed to the Warden, who also denied his request because "the Bureau ... has not implemented a program with provisions concerning your request." Id. at 11. On appeal to the Regional Administrator of the Bureau, the denial of Goodwin's request was affirmed because "the Warden's response [of no policy] was clear, concise and is our current position concerning artificial insemination." Id. at 13. Goodwin then filed this instant petition for a writ of habeas corpus, which was referred to a United States Magistrate for a report and recommendation. Apparently recognizing that the nonexistence of a policy was not a legitimate reason for denying Goodwin's request, the Bureau argued before the magistrate that Goodwin's request was frivolous and that he had not stated the violation of any constitutional right. J.A. at 31 (Report and Recommendation, No. 87-3438-CV-S-WRC, slip op. at 2 (W.D.Mo. Nov. 18, 1987)). The Bureau also argued that inmates have no right to conjugal visits or to consortium with their wives, see J.A. at 31, and also made what the magistrate described as "conclusory arguments of 'legitimate penological objectives' and burdensomeness." Id. at 33. The magistrate granted leave to Goodwin to proceed in forma pauperis, and recommended that his petition for a writ of habeas corpus be granted in part, directing that "Bureau either establish a uniform policy ... or individually evaluate [Goodwin's] request ..." Id. Sufficiently cued of the need to again buttress its rationale for denying Goodwin's request, the Bureau stated its policy prohibiting all artificial insemination for the first time in its Report to the Court and Partial Exceptions to the Magistrate's Report and Recommendation. Id. at 36-37. This is the policy we consider on appeal
 
 
 [4]
 The majority properly rejects most of the reasons because they "concern a much more sophisticated and intrusive type of artificial insemination" than that requested by Goodwin. Ante at 1399 n. 7. The majority also rejects the Bureau's concern about a potential added burden on the welfare rolls because such a concern is not a legitimate penological interest. Id. Finally, the majority properly rejects the Bureau's speculative concern about potential tort liability as "irrelevant" and "far-fetched." Id. While I agree with the majority's rejection of these reasons, I would also consider the Bureau's assertion of such speculative, irrelevant interests as evidence of an "exaggerated response" to Goodwin's request
 
 
 [5]
 While equal treatment of inmates is generally a legitimate penological interest, it need not be given the same weight as the prison's interest in protecting security, which has been recognized as "central to all other correctional goals." Pell, 417 U.S. at 823, 94 S.Ct. at 2804; see Hudson v. Palmer, 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984) (internal security is paramount goal of prison system). Nor is the interest of equal treatment related to other recognized prison interests, including the preservation of internal order and discipline, deterrence of crime, and rehabilitation of prisoners. See O'Lone, 482 U.S. at 348, 107 S.Ct. at 2404 (1987); Martinez, 416 U.S. at 412, 94 S.Ct. at 1810
 
 
 [6]
 Although the second Turner factor focuses on the nature of the deprivation of the inmate's right, I believe it is also appropriate to consider the deprivation of the rights of noninmates. The majority compares the denial of Mrs. Goodwin's procreation right with the denial of free association rights that spouses necessarily suffer as a result of an inmate's incarceration. Ante at 1399. In so doing, the majority misidentifies which of Mrs. Goodwin's rights have been primarily implicated, and consequently underestimates the nature and degree of the deprivation suffered by her. The Bureau's decision implicates Mrs. Goodwin's fundamental right to procreate within a marriage relationship. Mrs. Goodwin's associational rights, like those of family members of inmates generally, are indeed affected by the incarceration of her husband. However, her associational rights are not completely foreclosed because she can exercise these rights, at least to some extent, through prison visits with Goodwin and by freely associating with others outside the prison. In contrast, Mrs. Goodwin's fundamental right to procreate within a marriage relationship is completely foreclosed by the Bureau's policy, at least until Goodwin's release from prison. Moreover, the injury inflicted on Mrs. Goodwin from the Bureau's decision is more than one of mere delay. Although the majority attempts to minimize the risks of a late pregnancy, see ante at 1397, it is undisputed that the likelihood of her bearing a child with genetic abnormalities will double if she waits until age 35 to become pregnant. J.A. at 54 (Petitioner's Answer to Respondent's Exceptions)
 
 
 [7]
 The majority goes on to state that "[t]he accommodation of the female inmates is just the kind of 'ripple effect' to which the Turner Court referred. As a result, we should 'be particularly deferential to the informed discretion of [the Bureau] officials.' " Ante at 1400 (quoting Turner, 482 U.S. at 90, 107 S.Ct. at 2262 (citation omitted)). However, Turner directs us to consider whether accommodation of the "asserted right will have a significant 'ripple effect' " on prison administration. 482 U.S. at 90, 107 S.Ct. at 2262 (emphasis added). The ripple effect of accommodating female inmates is not before the court. In the present case, accommodation of Goodwin's right will have no perceivable ripple effect on prison administration, and thus we need not accord special deference to the discretion of the Bureau
 
 
 [8]
 Although the Bureau asserts that accommodation of Goodwin's request would result in a flood of similar request, there is no evidence in the record to support this contention. Artificial insemination has been available for several years, and this is the first time that a federal prisoner has made such a request